EL PUEBLO DE PUERTO RICO, promovente, *v.* CENTRAL CAMBALACHE, demandada.

Núm. 22.—*Sometido:* Abril 21, 1941. *Resuelto:* Junio 27, 1941.

*Hon. Procurador General George A. Malcolm,* y *Miguel Guerra-Mondragón, Rafael Rivera Zayas* y *Luis Venegas Cortés,* abogados asociados éstos, abogados del promovente; *Jaime Sifre* y *Earle T. Fiddler,* abogados de la demandada.

EL JUEZ ASOCIADO SEÑOR TRAVIESO emitió la opinión del tribunal.

En julio 19 de 1937, El Pueblo de Puerto Rico, previo permiso concedídole por este tribunal, radicó una querella de *quo warranto* contra la corporación del país Central Cambalache, imputándole haber violado las disposiciones de su carta corporativa y de las leyes federales e insulares limitativas de la tenencia de tierras por corporaciones dedicadas a la agricultura, y solicitando su disolución y la revocación de su franquicia.

En septiembre 7, 1940, el querellante radicó ante esta Corte Suprema una petición de *injunction,* en la que alega

que El Pueblo de Puerto Rico está listo para entrar a juicio y dispuesto a sustanciar en su fondo su querella de quo warranto contra Central Cambalache; que los directores de dicha corporación se proponen tomar un acuerdo para traspasar casi todas las tierras de la querellada a sus directores y accionistas con el propósito de hacer ineficaz la sentencia que pueda dictarse en el procedimiento de quo warranto; que de llevarse a cabo el proyectado traspaso, El Pueblo de Puerto Rico se vería privado del derecho que la ley le reconoce de comprar para sí todas las tierras de la querellada o de provocar la venta de las mismas en pública subasta, o, cuando menos, el querellante peticionario se vería envuelto en una multiplicidad de pleitos para proteger su derecho; que el querellante carece de todo otro remedio rápido, adecuado y eficaz, que no sea el de injunction, para salvaguardar sus intereses, los que quedarían perjudicados de no concederse el auto solicitado; y que de no impedirse los actos denunciados, la jurisdicción de esta corte en el procedimiento de quo warranto resultaría académica, con perjuicio para la política agraria de Puerto Rico y el bienestar económico de esta Isla. Pide el querellante que se dicte un auto de injunction por el que se ordene a la querellada y a sus directores, oficiales y subalternos que se abstengan de traspasar las tierras de la querellada a persona natural o jurídica alguna.

En septiembre 12 de 1940 comparecieron ante esta corte los señores José Matienzo Lescano, Angel Abarca Portilla, Lorenzo Oliver, José A. Rubert, Miguel Mocoroa, Milton I. Durlach, Felipe F. Vidal, Luis R. González, Ramón Morán, Juan Pizá, Feliciano Matienzo, José Matienzo, Jr., José Rodríguez Ante, Emilio V. Venegas y Vitaliano García, directores de la corporación querellada, y en contestación a la orden para mostrar causa, expedida por esta corte, y a la petición de injunction, alegaron en substancia lo siguiente:

1. Niegan que Central Cambalache haya cometido o cometa actos *ultra vires* al ser dueña y controlar más de 500

acres; que la carta constitutiva de la querellada contenga limitación alguna en cuanto al número de acres que Central Cambalache pueda tener y controlar; y que la tenencia o control de más de 500 acres por Central Cambalache constituya violación de ley alguna.

2. Niegan que se propongan aprobar acuerdo alguno con miras a hacer ineficaz la sentencia que pueda dictarse en el procedimiento de quo warranto.

3: Alegan que en la junta general de accionistas celebrada el 6 de septiembre de 1940, los accionistas de Central Cambalache aprobaron un acuerdo autorizando a los directores de la corporación para gestionar la venta de casi todas las propiedades de Central Cambalache, y que los directores se proponen recomendar a los accionistas que adopten los acuerdos que fueren necesarios para llevar a efecto el traspaso de dichos bienes.

4. Niegan que el injunction que se solicita sea necesario para salvaguardar intereses de El Pueblo de Puerto Rico, y alegan que los intereses que el querellante pueda tener han quedado protegidos mediante la anotación que de la querella se ha hecho en el Registro de la Propiedad, como *lis pendens*, sobre las fincas inscritas a nombre de Central Cambalache.

5. Niegan que la jurisdicción de esta Corte Suprema pueda ser afectada en forma alguna por cualquier traspaso que la querellada pueda hacer de sus propiedades o de parte alguna de ellas.

En la contestación se alegan además ocho defensas especiales, las cuales, sucintamente expuestas, son como sigue:

1ª. Que con el propósito de proteger su inversión en la corporación y de poner fin al procedimiento de quo warranto, algunos de los accionistas de Central Cambalache sugirieron al Procurador General de Puerto Rico que el Gobierno Federal o el Gobierno de Puerto Rico comprara las tierras de Cambalache en exceso de 500 acres, sobre la base de un pre-

cio justo y razonable; y que en junta general de accionistas celebrada en agosto 18, 1939, se aprobó el siguiente acuerdo:

"Por cuanto se ha radicado y se está tramitando ante el Tribunal Supremo de Puerto Rico un procedimiento de Quo Warranto contra esta compañía, basado en la alegación de que la compañía está violando sus artículos de incorporación y las disposiciones de la Resolución Conjunta del Congreso de Estados Unidos del 1ro. de mayo de 1900;.

"Por cuanto la compañía tiene entendido que la finalidad que, en efecto, persigue el Gobierno de Puerto Rico, con el referido procedimiento de Quo Warranto, es que esta compañía se desprenda de los terrenos que posee en exceso de 500 acres, y que éstos sean adquiridos por el propio gobierno o por personas o grupo de personas que no sean corporaciones; y

"Por cuanto la compañía, aunque entiende que no ha cometido violación alguna de la citada ley, ni de sus artículos de incorporación, por lo cual no renuncia, en su caso, a las defensas interpuestas en dicho procedimiento, está dispuesta a cooperar con el Gobierno para la consecución de los fines expuestos en el apartado que precede;

"Por tanto, *Resuélvese* por la Junta General de los Accionistas de la Central Cambalache:

"I. Que Central Cambalache está dispuesta a vender, bien a El Pueblo de Puerto Rico o a los Estados Unidos de América, o a cualquier agencia de cualquiera de dichos gobiernos o a cualquier otra persona o grupo de personas asociadas en forma no corporativa, todos los terrenos de esta compañía, con excepción de aquellos ocupados por la factoría, dependencias de ésta y vías férreas fijas, material rodante de tracción, sistema telefónico, caminos y cargaderos y otros anexos de la factoría y propiedades que se usen en el proceso de la elaboración de azúcar, incluyendo en la venta, plantaciones de caña, contratos de arrendamiento, aperos de labranza, ganado, y en general, todas las propiedades que tuviese la Central dedicadas a la siembra, cultivo y recolección de la caña de azúcar.

"II. Autorizar, como por la presente se autoriza, a la Junta de Directores de esta compañía para gestionar tal venta, sobre las bases que los directores determinen, sujeto a la aprobación y confirmación definitiva de los accionistas."

Que el mismo día 18 de agosto de 1939 la Junta de Directores de Central Cambalache aprobó un acuerdo redactado en términos idénticos a los del acuerdo aprobado por los accionistas, y facultando al presidente y vicepresidente de la

corporación para entregar al Procurador General de Puerto Rico copia certificada del acuerdo y para iniciar con el Gobierno Insular o con el Gobierno Federal o con cualquier individuo o grupo de individuos las negociaciones conducentes a la venta de las propiedades de Central Cambalache.

Que copia del acuerdo de los accionistas fué entregada al Procurador General de Puerto Rico, acompañada de una carta suscrita por los abogados de la querellada en la que, en substancia, se le comunicaba a dicho funcionario que Central Cambalache estaba dispuesta a vender las tierras que posee y controla, al Gobierno Insular o al Gobierno Federal o a cualquiera agencia de uno u otro gobierno. Se le informaba, además, que se le enviaba la copia del acuerdo con el fin de ''que el gobierno pueda dentro de un plazo razonable dar los pasos que considere deseables para adquirir las propiedades mencionadas en el acuerdo y bajo las condiciones sugeridas.''

Que en una conferencia convocada por el Procurador General, éste manifestó que el Gobierno carecía de fondos para comprar terrenos de centrales azucareras; que en vista de esas manifestaciones, un grupo de accionistas de Cambalache hizo preparar un plan el cual fué sometido al Departamento de Justicia por carta de mayo 14, 1940, suscrita por los abogados de la central. De acuerdo con el plan sometido, se organizaría un sindicato de accionistas de Central Cambalache, el cual actuaría independientemente de la corporación. Dicho sindicato haría una oferta a Central Cambalache para la compra de todas sus propiedades y equipo agrícolas con excepción de los 500 acres necesarios para sus fines industriales. Una vez adquiridas dichas propiedades, el sindicato dispondría de ella en bloques convenientes, en favor de varios grupos de individuos, los que poseerían dichos bloques en comunidad. En el plan se hace constar que sus proponentes asumen que si el Gobierno lo acepta y se lleva a cabo, el litigio pendiente será sobreseído; y, que todo lo

que se expone en el plan tiene como objeto el sentar las bases para el sobreseimiento del presente pleito y no será interpretado como una admisión por parte de la querellada de que haya violado ley alguna.

Que el Procurador General de Puerto Rico contestó en julio 22, 1940, informando a los proponentes del plan que el Gobierno carecía de fondos para comprar las tierras de Central Cambalache y que la División Legal para el Cumplimiento de la Ley de 500 acres había expresado la opinión de que el plan debía ser rechazado.

Que en agosto 26, 1940, los abogados de Central Cambalache escribieron al Procurador General rogándole les expusiera las razones por las cuales se había rechazado el plan, para en caso de ser posible hacer frente a las objeciones que pudieran haber.

Que si la opción que se pretende dar a El Pueblo de Puerto Rico por las secciones 1 y 2 de la ley núm. 47 de agosto 7 de 1935, puede ser ejercitada por el Gobierno por conducto del Procurador General, en tal caso El Pueblo de Puerto Rico ha optado ya por no comprar las tierras de la querellada, por lo cual es improcedente el injunction para proteger la alegada opción de compra.

Que las manifestaciones del Procurador General, unidas al hecho de que la Asamblea Legislativa no haya tomado acción alguna para hacer uso de la opción, demuestran que es muy remota la posibilidad de que El Pueblo de Puerto Rico adquiera las tierras de Central Cambalache, razón por la cual este Tribunal no estaría justificado en conceder un auto de injunction "que privaría a los recurridos y a Central Cambalache de tomar acción que en ausencia de dicha pretendida o alegada opción tienen el derecho a tomar de acuerdo con la ley."

2ª. Que la junta general de accionistas de Central Cambalache, celebrada en septiembre 6, 1940, aprobó un acuerdo para declararse en receso hasta el día 20 del mismo mes con

el fin de que los directores tuviesen una oportunidad para preparar un plan de reorganización de la corporación y someterlo a la aprobación de los accionistas; que los recurridos admiten que tienen el propósito de someter a los accionistas, siempre que no se lo prohiba una orden judicial, un proyecto para llevar a efecto la enajenación de las tierras de la central de acuerdo con las bases del plan sometido al Procurador General; que los recurridos anticipan que dicho proyecto será aprobado por más de dos terceras partes del capital emitido; y que la venta proyectada no viola ley alguna insular o federal, siendo un derecho inalienable que tienen la querellada y sus accionistas el de vender las propiedades de la corporación o distribuirlas entre sus accionistas.

3ª. En la tercera defensa especial se alega que la ley núm. 47 de agosto 7 de 1935, en cuanto concede al Pueblo de Puerto Rico opción para comprar las tierras o hacer que sean vendidas en pública subasta, es inválida: (1) porque la ley incluye más de un asunto y uno de ellos no está expresado en su título; (2) porque permite la imposición de penalidades, dejando su elección o imposición a poderes que no son el poder judicial; (3) porque invoca el poder de expropiación forzosa, sin una declaración de necesidad y conveniencia que lo justifique, sin garantía del pago de una justa compensación, lo cual priva a Central Cambalache de su propiedad sin el debido proceso de ley; (4) porque priva a los accionistas de su derecho a adquirir los bienes de la central y del derecho, en caso de disolución de la corporación, a adjudicarse el activo después de cubierto el pasivo de la misma; y (5) por ser legislación *ex post facto*.

4ª. Que el Procurador General de Puerto Rico no está autorizado por ley alguna para ejercitar a nombre de El Pueblo de Puerto Rico la opción para comprar las tierras o hacerlas vender en subasta pública; y que la adquisición de terreno por El Pueblo de Puerto Rico es y ha sido una facultad del

poder legislativo que no ha sido delegada al Procurador General.

5ª. Que la citada ley núm. 47 no confiere a El Pueblo de Puerto Rico el derecho a comprar los bienes de la querellada, y solamente establece el procedimiento para el caso en que El Pueblo de Puerto Rico, de acuerdo con la ley núm. 44 de agosto 6, 1935, hubiere previamente desarrollado un plan de reconstrucción económica, aprobado por la Comisión Económica, circunstancias que no se alegan ni en la querella ni en la petición de injunction, y que, según información y creencia de los recurridos, no existen.

6ª. Que las disposiciones de la ley núm. 47 de 1935 no pueden ser razonablemente interpretadas en el sentido de que las tierras deban necesariamente ser vendidas en pública subasta o en el sentido de que El Pueblo de Puerto tiene un derecho absoluto a provocar tal venta y sí en el sentido de que la intención de la Asamblea Legislativa fué proveer la venta en subasta pública como uno de los medios posibles de poner las tierras en manos de personas capacitadas para poseerlas, si ese resultado no se obtuviera por los medios legales, y que no puede presumirse que la Asamblea Legislativa tuvo el propósito de privar a los accionistas de la corporación de los derechos adquiridos bajo las secciones 27 y 31 de la Ley de Corporaciones.

7ª. Que ni en la querella ni en su súplica se solicita remedio alguno en cuanto a la disposición que deba dársele a los bienes de la querellada, ni se solicita remedio alguno con respecto a dichos bienes o para hacer uso de la opción que a su favor alega tener el querellante.

8ª. Que tanto las alegaciones de la querella como las de la petición de injunction son insuficientes para justificar la expedición del auto de injunction que se solicita.

En el acto de la vista, celebrada en septiembre 12, 1940, la querellada ofreció en evidencia y fueron admitidas sin objeción copias certificadas de los acuerdos de accionistas y di-

rectores y de la correspondencia entre los abogados de la querellada y el Procurador General, a los que se hace referencia en la contestación. Las partes acordaron someter el caso por alegatos, el último de los cuales fué radicado en abril 18, 1941.

Antes de discutir y resolver aquellas cuestiones legales que a nuestro juicio están necesariamente envueltas en este incidente del litigio, creemos conveniente hacer la siguiente declaración de hechos probados:

1°. Contra Central Cambalache, corporación organizada bajo las leyes de Puerto Rico, se ha incoado por El Pueblo de Puerto Rico ante esta Corte Suprema el procedimiento de Quo Warranto núm. 3, en el que se le imputa que en violación de su carta constitutiva y de las leyes vigentes posee y controla tierras de labrantío en exceso de 500 acres.

2°. Que la querella de quo warranto ha sido anotada en el Registro de la Propiedad, mediante aviso de lis pendens, sobre todas las tierras de la querellada.

3°. Que después de iniciado y durante la pendencia del caso de quo warranto, los abogados de la corporación querellada, en cumplimiento de acuerdos de los accionistas y directores de la misma, practicaron gestiones tendientes a transigir el litigio pendiente mediante la venta a El Pueblo de Puerto Rico de las tierras en exceso de 500 acres pertenecientes a la querellada, y con ese fin ofrecieron dichas propiedades en venta al Procurador General de Puerto Rico. La oferta fué rechazada por no haber fondos disponibles. Los mismos abogados sometieron más tarde a la aprobación del Procurador General un plan para el traspaso de las tierras de Central Cambalache a un sindicato de accionistas. El plan fué rechazado por haber sido desaprobado por el Departamento de Justicia.

4°. Que la querellada y sus accionistas y directores se disponen a llevar a efecto el plan para el traspaso de las tierras a un sindicato, a menos que se les prohiba por orden judicial.

■ La primera cuestión fundamental que debemos considerar y resolver es: ¿Cuál es el interés o derecho de El Pueblo de Puerto Rico que deba ser protegido mediante el auto de injunction que se solicita?

La política pública enunciada por el Congreso y por la Asamblea Legislativa de Puerto Rico tiende a evitar las grandes concentraciones de tierras de labrantío y a disolver los latifundios existentes y organizados en violación de las leyes vigentes que limitan a 500 acres las tierras que una corporación agrícola puede legalmente poseer y controlar. Con el propósito de hacer cumplir la prohibición congresional e imponer sanciones por sus violaciones, la Asamblea Legislativa aprobó la ley núm. 33 de julio 22, 1935 ((2) pág. 418) por la cual confirió a la Corte Suprema de Puerto Rico jurisdicción original y exclusiva de todos los procedimientos de Quo Warranto que el Gobierno de Puerto Rico pueda instituir por violaciones de las leyes limitativas de la tenencia de tierras por corporaciones.

Es cierto, como alegan los recurridos, que generalmente un procedimiento de quo warranto no impide que la corporación querellada venda o traspase sus bienes mientras el procedimiento está pendiente; y es cierto también, que generalmente el Estado en un procedimiento de esa naturaleza no tiene interés en las propiedades de la corporación querellada. Así lo sostiene la jurisprudencia por ellos citada, con la cual estamos conformes aunque la consideramos inaplicable a la situación que nos presenta el caso de autos. Todos los casos citados se refieren a casos corrientes de quo warranto, en los que la única cuestión que se debatía era el derecho de la querellada a continuar haciendo uso de su franquicia corporativa, sin que el Estado alegase tener derecho o interés alguno en la disposición que de sus propiedades hiciera la corporación antes o después del decreto de disolución.

Los recurridos basan su alegado derecho a enajenar las tierras de Central Cambalache durante la pendencia de este

procedimiento, en el caso de *Havemeyer* v. *Superior Court*, 84 Cal. 327, en el que se dijo:

"Parece, en verdad, que en uno de los alegatos se ha insinuado, más bien que urgido, la contención de que una compra *pendente lite* es un fraude en contra de los derechos del Estado en casos como el presente, y que es por tanto nula. Empero, no aparece que exista fundamento alguno para esta contención. El Estado por virtud de su acción no ha adquirido gravamen alguno sobre ninguna de las propiedades de la corporación, y es difícil comprender qué fundamentos pueda tener para impugnar una venta *pendente lite*."

En los casos como el de autos y otros similares, incoados originalmente ante esta Corte Suprema por virtud de las disposiciones de la citada ley núm. 33 de 1935, se trata no solamente del derecho de la corporación querellada a continuar su vida corporativa, si que también de la disposición final que deberá hacerse de las tierras adquiridas, poseídas y controladas por la querellada en contravención no solamente de sus cláusulas corporativas, si que también en abierta oposición a la política pública del Pueblo de Puerto Rico.

Para hacer frente a una situación especial—muy distinta a la de los casos corrientes de quo warranto—la Asamblea Legislativa Insular aprobó también la ley núm. 47 de agosto 7 de 1935 ((2) pág. 531), enmendando las secciones 2 y 6 de la ley, las cuales, en lo que es pertinente, leen ahora así:

"Sección 2.—Cuando alguna persona usurpare o ilegalmente ejerciere o desempeñare funciones de algún cargo público....o cuando alguna corporación haga u omita algo que equivalga a la renuncia o a la pérdida de los derechos y privilegios que como a tal corporación le corresponden; o cuando ejercite derechos no conferidos por la ley, el Fiscal General o cualquier fiscal de la respectiva corte de distrito, ya obrando por su propia iniciativa, ya a instancias de otra persona, podrá radicar ante cualquier corte de distrito de Puerto Rico una solicitud para que se instruya información de la naturaleza del *quo warranto,* a nombre de El Pueblo de Puerto Rico; o cuando cualquier corporación por sí, o a través de cualquier otra entidad subsidiaria o afiliada o agente ejercite derechos o realice actos o contratos en contravención a las expresas disposiciones de la Carta

Orgánica de Puerto Rico o de cualquiera de sus estatutos, el Fiscal General o cualquier fiscal de distrito, ya obrando por su propia iniciativa, ya a instancias de otra persona, podrá radicar ante el Tribunal Supremo de Puerto Rico una solicitud para que se instruya información de la naturaleza del *Quo Warranto* a nombre de El Pueblo de Puerto Rico; y si a juicio de la corte ante la cual se radicare el asunto resultare de las alegaciones que existe probable fundamento para instruir las diligencias del caso, podrá acceder a la petición y ordenar que se instruya la información de acuerdo con la solicitud...

"Cuando cualquier corporación por sí o a través de cualquier otra entidad subsidiaria o afiliada o agente esté poseyendo ilegalmente, por cualquier título bienes inmuebles en Puerto Rico, El Pueblo de Puerto Rico podrá, a su opción, dentro del propio procedimiento, instar la confiscación de dichos bienes, a su favor, o su enajenación en subasta pública, dentro de un término no mayor de seis meses a contar desde la fecha en que se dicte sentencia final.

"En todo caso la enajenación o confiscación se hará previa la indemnización correspondiente en la forma establecida en la Ley de Expropiación Forzosa.

"Sección 6.—En caso de que alguna persona o corporación contra quien se haya hecho la petición resultare culpable, la corte podrá dictar su fallo, despojando a dicha persona o corporación del cargo o franquicia a que se refiere la petición, y podrá multar a dicha persona o corporación por la usurpación o desempeño ilegal de tal cargo, o de dicha franquicia, o su intrusión en él o en ella, y podrá también imponer al demandado el pago de las costas de las actuaciones; *Disponiéndose,* que siempre que se dictare sentencia declarando que el demandado ha usurpado o ejerce ilegalmente las funciones de algún cargo público, dicho demandado deberá cesar inmediatamente en el desempeño de tal cargo, abandonando el mismo; y si dejare de hacerlo, la corte a solicitud del Attorney General, o de cualquier persona con interés en el cargo, ordenará que se libre mandamiento al márshal, ordenándole proceder al lanzamiento del demandado.

"En todos los casos en que quedare satisfactoriamente probado, a juicio de la corte que la corporación o corporaciones, han realizado actos o ejercitado derechos no conferidos por la ley, o en contravención a las expresas disposiciones de la misma, en la sentencia que recaiga, se decretará la disolución de la entidad demandada, si fuere doméstica, la prohibición de continuar haciendo negocios en el país, si fuere extranjera, la nulidad de todos los actos y contratos reali-

zados por la corporación o entidad demandada, y se decretará, además, la cancelación de los asientos o inscripciones que los mismos hayan producido en los registros públicos de Puerto Rico, y cuando el decreto de nulidad afecte a bienes inmuebles y El Pueblo de Puerto Rico hubiere optado por su confiscación, o se ordenare la venta en pública subasta, la sentencia final fijará el precio razonable que deba pagarse por los mismos. A estos efectos deberá fijarse el justo valor de los bienes sujetos a enajenación o confiscación en la misma forma fijada en los casos de expropiación forzosa.''

Es evidente que El Pueblo de Puerto Rico tiene interés en que se cumpla estrictamente lo dispuesto en las leyes vigentes y en que se ponga en vigor la política pública enunciada y concebida con el propósito de defender y promover el bienestar económico de la comunidad insular; y que tiene un derecho de opción, para la compra de las tierras o para solicitar su venta en pública subasta, derecho que está reconocido por el estatuto y su validez sostenida por decisión de esta Corte Suprema y de la Corte de Circuito para el Primer Circuito. Ese derecho debe ser protegido contra cualquier plan o proyecto que tienda, como se alega en el presente caso, a obstaculizar a El Pueblo de Puerto Rico en el ejercicio de la opción y a hacer posible que la querellada siga poseyendo y controlando, a través de un sindicato de sus accionistas, las mismas tierras que ha venido poseyendo y aún posee y controla en violación de la ley.

Consideremos ahora las defensas especiales en el mismo orden en que han sido expuestas.

La primera y la segunda carecen en absoluto de méritos. Las conversaciones o negociaciones habidas entre dos partes litigantes, con miras a transigir la cuestión litigiosa pendiente ante los tribunales, no pueden ser aducidas como defensa por una de las partes en contra de la otra. La oferta de transacción hecha por una parte no produce efecto legal alguno, ni puede ser presentada en evidencia, contra la otra parte, mientras ésta no la haya aceptado. Es tan elemental este principio de derecho, que en ahorro de tiempo

nos abstendremos de buscar jurisprudencia para sostenerlo. Los propios recurridos admiten que la oferta hecha por ellos al Procurador General fué rechazada, como lo fué también el proyecto para la llamada reorganización de la corporación querellada. El Pueblo de Puerto Rico no está obligado a ejercitar su opción cuando así convenga a los intereses de la querellada. Más aún, ese derecho de opción no tiene existencia legal y por tanto no puede ser ejercitado hasta que se haya dictado sentencia en contra de la querellada decretando su disolución.

La interpretación que dimos a la sección 2 de la Ley de Quo Warranto, supra, en nuestra orden de julio 26, 1940, nombrando un *receiver* de las propiedades de la querellada en el caso de *El Pueblo de Puerto Rico* v. *Rubert Hermanos, Inc.*, 57 D.P.R. 958 *a*, fué sostenida por la Corte de Circuito de Apelaciones en su decisión de marzo 31 de 1941, 118 F. (2d) 752.

■ Las mismas cuestiones levantadas por la tercera defensa especial fueron levantadas en el caso de *Rubert Hermanos, Inc.*, supra, y resueltas en contra de la corporación querellada tanto por esta corte como por la de Circuito.

Veamos cómo resolvió la Corte de Circuito la contención de que la ley núm. 47 de 1935, en cuanto concede a El Pueblo de Puerto Rico opción para la compra de las tierras o para pedir su venta en pública subasta, es inválida por ser legislación *ex post facto:*

"La validez de la disposición sobre la opción es impugnada principalmente por el fundamento de que es por su naturaleza una penalidad *ex post facto,* prohibida por la Ley Orgánica, 48 U.S.C.A. sec. 737. Como principio para la argumentación, puede plausiblemente sostenerse que la disposición no es en manera alguna una penalidad y sí una medida procesal para disolver la concentración de tierras en manos de las corporaciones, formada en violación de la política pública expresada en la Resolución Conjunta y en la legislación territorial. Comoquiera que sea, y asumiendo, sin decidirlo, que la disposición es una penalidad, todavía no vemos por qué su aplica-

ción en este caso es *ex post facto*. Después de la aprobación de la ley núm. 47, en agosto 7, 1935, la corporación continuó poseyendo el número de acres prohibido, sin dar paso alguno para disponer de las tierras excedentes y sin manifestar intención alguna de así hacerlo. Asumiendo que la corporación tuviese derecho a la concesión de un término razonable, después de la aprobación de la ley, para disponer de dichas tierras, antes de que la alegada penalidad de venta en pública subasta pudiera ser legalmente impuesta, la corporación en este caso tuvo ese término razonable y nada hizo.... En vista de lo que la corte consideró una violación continua de la ley por un período tan largo después de la aprobación de la Ley núm. 47, la alegada penalidad, si se aplica en el caso ante nos, no es *ex post facto*.'' 118 F. (2d) 752, 758.

Las alegaciones de que la opción es inválida porque priva a la querellada de su propiedad sin el debido proceso de ley y a los accionistas del derecho, en caso de disolución, a adjudicarse el activo después de cubierto el pasivo, no merecen seria consideración. La corporación no puede ser privada de sus propiedades sino después de ser vencida en juicio y después que se haya decretado su disolución por sentencia definitiva y firme. Y la ley expresamente provee que en todo caso la enajenación o confiscación se hará mediante la correspondiente indemnización, según lo dispuesto en la ley de expropiación forzosa. Los accionistas no tienen derecho a quejarse. No podrán dividirse y adjudicarse las tierras poseídas ilegalmente por la corporación, pero sí podrán repartirse, en proporción al número de acciones de cada uno, el importe del valor de esas mismas tierras.

En su oposición al injunction la querellada adopta posiciones distintas, que resultan incompatibles entre sí. Alega en su primera defensa que el injunction es improcedente para proteger la opción de El Pueblo de Puerto Rico, porque éste optó ya por no comprar las tierras, cuando el Procurador General rechazó la oferta que le hicieran los abogados de la querellada. Y en la cuarta defensa sostiene que el Procurador General no está autorizado por ley alguna para ejercitar la opción a nombre de El Pueblo de Puerto

Rico. La incompatibilidad entre una y otra defensa es evidente.

La cuestión sobre la carencia de facultad del Attorney General para ejercitar la opción a nombre de El Pueblo de Puerto Rico fué levantada también en *Rubert Hermanos, Inc.* v. *People of Puerto Rico*, 118 F. (2d) 752, 760. La Corte de Circuito se negó a considerarla, diciendo:

"Sostiene la apelante que la ley núm. 47, debidamente interpretada, no confiere facultad al Procurador General para ejercitar la opción a nombre de El Pueblo de Puerto Rico, y sí requiere que la elección sea hecha mediante un acto legislativo. Esta cuestión no la resolvemos ahora, porque la Corte Suprema de Puerto Rico no ha tenido una oportunidad para considerarla. La cuestión puede ser sometida a dicha corte cuando el caso le sea devuelto."

La sumisión que de dicha cuestión pretende hacerse en el estado actual de los procedimientos es, a nuestro juicio, prematura y académica, por las razones que pasamos a exponer.

No hay constancia alguna en el récord, de que el Procurador General haya ejercitado o tratado de ejercitar la opción de compra o de venta en pública subasta. Y no puede haberla, por la simple razón de que ese derecho de opción no tiene existencia legal y no puede ser ejercitado, ni por el Procurador General ni por el Poder Legislativo, sino hasta después que se haya dictado una sentencia final decretando la disolución de la corporación querellada y la cancelación de su franquicia.

En el citado caso de *Rubert Hermanos, Inc.*, como en el presente, se alegó que la opción había caducado, porque, de acuerdo con sus términos, El Pueblo debe hacer uso de ella antes de que se dicte sentencia de disolución, cosa que no se hizo en el caso de *Rubert Hermanos, Inc.* Al confirmar la interpretación que dimos al estatuto creador de la opción, la Corte de Circuito se expresó así:

"Se alega que la opción ha caducado, porque de acuerdo con sus términos El Pueblo debe ejercitarla con anterioridad a la sentencia de disolución, y esto no fué hecho. La sección primera de la ley

núm. 47 dispone que 'El Pueblo de Puerto Rico podrá, a su opción, dentro del propio procedimiento, instar la confiscación de dichos bienes, a su favor, o su enajenación en subasta pública dentro de un término no mayor de seis meses a contar desde la fecha en que se dicte sentencia final.' La sección 2 dispone que 'cuando el decreto de nulidad afecte a bienes inmuebles y El Pueblo de Puerto Rico hubiere optado por su confiscación, o se ordenare la venta en pública subasta, la sentencia final fijará el precio razonable que deba pagarse por los mismos.' La contención es que la cláusula 'dentro de un término no mayor de seis meses a contar desde la fecha en que se dicte sentencia final' cualifica solamente la última cláusula precedente 'o su enajenación en subasta pública'; y por tanto que es la venta la que debe tener lugar dentro de seis meses a partir de la fecha en que se dicte sentencia final. La corte inferior, sin embargo, interpreta la sección 1 en el sentido de que El Pueblo de Puerto Rico tiene seis meses después que la sentencia de disolución se convierte en final, dentro de los cuales solicitar en el procedimiento de quo warranto la confiscación o venta en pública subasta; que esta sentencia no se convirtió en final hasta que el mandato de la Corte Suprema de los Estados Unidos fué recibido por el secretario de la Corte Suprema de Puerto Rico, en mayo 13, 1940, de manera que la opción podía ser ejercitada en cualquier momento hasta el 13 de noviembre de 1940. Creemos que ésta es una razonable, tal vez la más razonable, interpretación de la ley, y siendo esto así, aceptamos la interpretación que al estatuto local ha dado la corte insular. La sección 2 de la ley núm. 47 no significa necesariamente, como contienden los apelantes, que ha de haber una sola sentencia final en el curso de los procedimientos de quo warranto. Puede haber un 'decreto final de nulidad' al resolverse que la corporación como resultado de sus actos ha perdido su franquicia; y si, con posterioridad, El Pueblo optase por que la propiedad fuese vendida en subasta pública, en ese caso puede haber, dentro del mismo procedimiento, una 'sentencia final' ordenando la venta y fijando 'el precio razonable que deba pagarse por los mismos.' Los procedimientos de quo warranto no terminaron con la confirmación por la Corte Suprema de los Estados Unidos de la 'sentencia de nulidad.' En verdad, el mandato de la Corte Suprema de los Estados Unidos devolvió el caso a la Corte Suprema 'para procedimientos ulteriores,' lo cual razonablemente incluye cualesquiera procedimientos que sean necesarios por el ejercicio subsiguiente de la opción.''

"En conclusión sostenemos que después que la sentencia de disolución fué finalmente confirmada, todavía estaba abierto para El Pueblo el ejercicio de la opción, y que la Corte Suprema de Puerto Rico tenía jurisdicción en los procedimientos ulteriores de quo warranto para conocer de y actuar sobre una solicitud subsiguiente por El Pueblo en el ejercicio de la opción dentro del período de seis meses.''

En el caso de autos no se ha dictado aún una sentencia final de disolución, y por lo tanto, el término para el ejercicio de la opción, por quien tenga facultad para ello, no ha empezado a correr. Si es el Procurador General, o el Gobernador o la Asamblea Legislativa a quien corresponda hacer uso de la opción, es cuestión que resolveremos cuando nos sea debida y oportunamente sometida.

Las cuatro últimas defensas especiales son prácticamente una reiteración de lo dicho en las otras, y deben ser desestimadas por las razones que hemos expuesto al desestimar las anteriores.

■ La anotación en el Registro de la notificación de *lis pendens* no es a nuestro juicio un obstáculo para la concesión del injunction que se solicita. La función del aviso de *lis pendens* es poner en conocimiento del comprador o del que adquiera un gravamen sobre la propiedad en litigio, de la acción pendiente. La anotación de *lis pendens* no impide el traspaso de la propiedad a quien quiera adquirirla sujeta a sus efectos legales. La función del injunction es mantener el statu quo, impidiendo que la propiedad sea transmitida a terceras personas y evitando la multiplicidad de pleitos que se originarían como consecuencia de los traspasos subsiguientes que pudieran hacerse.

En el presente caso, la querellada, poseedora de tierras en exceso de las que la ley le permite tener, se propone, durante la pendencia de un procedimiento de quo warranto, después de haber sido sometida a la jurisdicción de esta Corte Suprema y sin previa autorización judicial, traspasar a un sindicato formado por sus propios accionistas las tie-

rras en litigio, sobre las cuales el querellante tiene un derecho de opción, que no está obligado a ejercitar hasta que se haya dictado sentencia final. El proyectado traspaso—que deberá hacerse sujeto al lis pendens—no puede tener otro objeto que no sea el de obstaculizar al querellante en el ejercicio de la opción. Si se permitiese que los accionistas adquiriesen las propiedades, como dueños en común y pro indiviso, el resultado probable sería una multiplicidad de pleitos y procedimientos judiciales. La muerte de uno o más accionistas, haría pasar su interés en las tierras a sus herederos, con las consiguientes complicaciones si alguno de los herederos fuese menor de edad. El embargo por un acreedor de la participación o condominio de un accionista traería nuevas complicaciones. Todo ello puede evitarse dejando el título de las propiedades donde ahora se encuentra, hasta la terminación del litigio pendiente entre la corporación, alegada violadora de la ley, y El Pueblo que trata de hacer cumplir sus leyes y enforzar su política agraria. Desde la fecha en que se aprobó la ley núm. 47 de agosto 7, 1935, hasta la fecha en que se radicó la querella de quo warranto, julio 19 de 1937, tuvo la querellada amplia oportunidad para ajustarse a la ley, deshaciéndose de las tierras excedentes. No lo hizo así. Optó por poner a prueba la validez de sus títulos y obligó con ello al Gobierno a iniciar el procedimiento de quo warranto, para que bajo la autoridad y dirección de esta Corte Suprema se haga respetar y cumplir el mandato de la ley.

*Por las razones expuestas debe declararse con lugar la petición y ordenarse la expedición del auto de injunction solicitado, sin fianza, por no exigirla el artículo 681 del Código de Enjuiciamiento Civil, ed. 1933.*